MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2026 ME 83
Docket:      Pen-25-170
Argued:      February 3, 2026
Decided:     August 6, 2026

Panel:       STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

STATE OF MAINE

v.

DJVAN CARTER

MEAD, J.

[¶1]  Djvan Carter appeals from a judgment of conviction of aggravated attempted murder (Class A), 17-A M.R.S. § 152-A(1)(D) (2026), elevated aggravated assault (Class A), 17-A M.R.S. § 208-B(1)(B) (2026), kidnapping (Class A), 17-A M.R.S. § 301(1)(B)(2) (2026), and domestic violence aggravated assault (Class B), 17-A M.R.S. § 208-D(1)(D) (2026), entered in the trial court (Penobscot County, *Ociepka, J.*) following a jury trial.

[¶2]  Carter argues that (1) the court erred by finding that he had voluntarily waived his prior invocation of his right to silence and therefore declining to suppress his statements to detectives; (2) there was insufficient evidence to support a finding of "extreme cruelty" as an element of aggravated attempted murder; (3) his sentence of life imprisonment is disproportionate

2

for the offense of aggravated attempted murder; and (4) the court applied a "trial penalty" against him at sentencing for exercising his right to trial. We affirm the convictions and the sentence of life imprisonment.

## I. BACKGROUND

[¶3] "Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt." *State v. Tieman*, 2019 ME 60, ¶ 2, 207 A.3d 618 (quotation marks omitted).

[¶4] Carter was in a relationship with the victim, and they lived together at her home. They regularly used methamphetamines together. On May 25, 2023, Carter called the victim and believed he heard her engaging in infidelity. The next morning, May 26th, at approximately 4:30 a.m., the victim woke up and found Carter upset. After the victim got out of bed to make coffee, Carter forced her to the ground and began to strangle her. The victim could not breathe and believed that Carter was going to kill her. Eventually, Carter stopped strangling her, sat her on the bed, and began interrogating her about the suspected infidelity. During this time, Carter threatened to cut her into pieces for her children to find when they returned home.

[¶5]  After about a half hour, the victim managed to escape the home and ran towards her neighbor's house while yelling for help.  Carter chased after her and knocked her unconscious with a hammer.  He then dragged the victim to her car and placed her in the passenger seat.

[¶6]  When the victim regained consciousness, she and Carter were sitting in her vehicle off a dirt road in the woods.  Carter forced the victim to look at herself in the car's visor mirror, and she saw two holes in her head, one at each temple.  The victim fell in and out of consciousness during this time but recalled Carter telling her that she was going to die and forcing her to smoke methamphetamine.  Carter continued to bludgeon her with the hammer during this time.  At one point, Carter called his sister, after which the sister called the mother of Carter's children, who then called 9-1-1.

[¶7]  Once the police were notified, they were able to ping the victim's cell phone and ascertain its location in the woods near Alton.  Two Maine State Troopers arrived at the location, and one was able to spot movement inside the victim's vehicle.  After the troopers ordered Carter out of the car, he drove backwards into a gate across the road and then sped forward towards the officers.  One of the troopers then fired into the vehicle, striking Carter and incapacitating him.

4

[¶8] After the victim exited the vehicle, her physical state was so severe that one of the troopers believed that she had accidentally been shot in the head. The victim was transported to Northern Light Eastern Maine Medical Center, where she was assessed as a tier one level trauma, indicating significant injuries. Medical providers determined that she had more than twenty skull fractures, both subdural and epidural hematomas (brain bleeds), and a shattered orbital bone, creating a risk of blindness.

[¶9] A surgeon who treated the victim testified at trial that the injuries were "extensive, severe, and appallingly horrific," and noted that death is a possibility when a patient has head trauma.

[¶10] On May 27th, while Carter was in the hospital for the gunshot wounds he sustained, detectives attempted to interview him and read him his *Miranda* rights; Carter declined to speak with them. Two days later, Carter asked the officer guarding him who the lead detective was on his case, and the officer asked him if he wanted to speak to that detective. Carter answered that he did. When the detectives arrived, they immediately asked Carter if he still wanted to speak with them. After Carter said that he did, the detectives again advised Carter of his *Miranda* rights and asked him to confirm his understanding of his rights by explaining the rights back to them. They then

had Carter sign a written *Miranda* waiver form. Carter then made statements to the detectives that the State intended to use at trial.

[¶11] The State filed a criminal complaint against Carter on May 30, 2023, and he was indicted on August 30, 2023, for aggravated attempted murder, elevated aggravated assault, kidnapping, and domestic violence aggravated assault. The court (*Roberts*, *J.*) held a suppression hearing on March 22, 2024, and denied Carter's motion to suppress the statements he made to detectives while he was in the hospital.

[¶12] The court (*Ociepka*, *J.*) held a three-day jury trial from January 21 to 23, 2025. The jury returned a guilty verdict on all counts.

[¶13] The court conducted a sentencing hearing on March 31, 2025, and sentenced Carter to life imprisonment on the charge of aggravated attempted murder, imposed concurrent sentences of thirty years on each of the charges of elevated aggravated assault and kidnapping, and imposed a concurrent ten-year sentence on the charge of domestic violence aggravated assault.

[¶14] Carter filed a timely notice of appeal and an application to allow an appeal of sentence. *See* 15 M.R.S. §§ 2115, 2151 (2026); M.R. App. P. 2B(b)(1), 20. The Sentence Review Panel granted the application, and we considered the

6

sentence appeal with the appeal from the conviction. *State v. Carter*, No. SRP-25-171 (Me. Sent. Rev. Panel Jul. 26, 2025); M.R. App. P. 20(h).

## II. DISCUSSION

### A. Motion to Suppress Statements to Law Enforcement

[¶15]  Carter makes a narrow and nuanced argument that follows his broad assertion in his brief that he "did not voluntarily waive his previous invocation of his right to silence." Specifically, Carter delimits his argument to the following:

> In the days after being shot by police, Mr. Carter lay in his hospital bed. He was coming off a multi-day methamphetamine binge. He did not have the capacity to voluntarily waive his previously invoked right to silence when subsequently prompted by law enforcement.[1]

[¶16]  "We review the motion court's factual findings for clear error, and we review issues of law and the ultimate determination of whether statements should be suppressed de novo." *State v. Grant*, 2008 ME 14, ¶ 18, 939 A.2d 93.

---

[1]  Regarding his additional assertion that his waiver was "prompted by law enforcement," the record is clear that Carter asked a law enforcement officer for the name of the lead detective, and the officer asked Carter if he wanted to speak to the detective. Carter answered that he did, and the officer notified the detective, who came to the hospital with his partner. Upon these facts, and as further discussed in greater detail below, we cannot conclude that Carter's waiver was *prompted* by law enforcement.

[¶17]  We note at the outset of our discussion that Carter presented no evidence at the suppression hearing that he was suffering from withdrawal symptoms or that the opioids had affected his decision to speak with the detectives.  Even if Carter had demonstrated that he was under the influence of opioids or methamphetamine withdrawal, this alone would not be enough to render his waiver involuntary.  *Cf. State v. Bleyl*, 435 A.2d 1349, 1360 (Me. 1981) ("The fact that a person being interrogated in custody is under the influence of drugs does not, in itself, render a confession involuntary.").  In the absence of such evidence, we affirm the suppression court's conclusion that Carter had the capacity to voluntarily waive his previously invoked right to silence.[2] *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (holding that, under the due process clause of the federal constitution, a waiver of *Miranda* rights must be proved by the prosecution by a preponderance of the evidence).

[¶18]  Carter cites *Smith v. Illinois*, 469 U.S. 91, 98 (1984), in support of his argument that his initial exercise of his right to silence created a "bright-line prohibition" without which the authorities, through badgering or overreaching,

---

[2]  While it is unclear whether Carter invoked only his federal due process rights or also his state due process rights, it is immaterial to our discussion because on appeal Carter failed to adequately develop a state constitutional argument.  *See State v. Moore*, 2023 ME 18, ¶¶ 19-20, 290 A.3d 533 (declining to engage in a separate analysis of the Maine Constitution where the defendant "made no argument based on the state constitution [at trial] but merely referenced it," and "[did] not engage[] in an adequate analysis on appeal").

explicit or subtle, deliberate or unintentional, might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier invocation of rights.

[¶19]  Once a suspect in custody has invoked the right to remain silent, any questioning by law enforcement must cease.  *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966).  After an individual has invoked the right to silence, the individual "cannot be found later to have waived that right by responding to later police questioning unless his invocation of that right has been 'scrupulously honored.'"  *Grant*, 2008 ME 14, ¶ 41, 939 A.2d 93 (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)).

[¶20]  The "scrupulously honored" standard is addressed by a four-factor balancing test.[3]  *Id.* ¶ 42.  "These factors are[] (1) whether police immediately cease the interrogation when the defendant invokes the right to remain silent; (2) whether a significant amount of time passes before questioning is resumed; (3) whether fresh *Miranda* warnings are provided; and (4) whether the later

---

[3]  Carter cites *State v. McLain*, 2025 ME 87, ¶ 62, 345 A.3d 141, for the proposition that a waiver of a previous invocation of the privilege against self-incrimination must be clear and unequivocal and to discuss the "purposes of Maine's constitutional protections against self-incrimination" in the context of waiver, but otherwise does not suggest or argue that we should change or modify our jurisprudence on waiver or the test we adopted in *Grant* to determine whether an invocation of the privilege against self-incrimination has been scrupulously honored.

interrogation is restricted to matters distinct from the former." *Id.* (quotation marks omitted).

[¶21] The record here establishes that, after Carter was transported to the hospital around 9:55 in the morning of May 26th, the police attempted to question him on May 27th but immediately ceased their interrogation when he invoked his *Miranda* right to remain silent. The police did not speak to Carter at any point throughout the afternoon or evening of May 27th or the entirety of May 28th. The detectives returned on May 29th, after the exchange between Carter and the officer guarding him. When the second meeting between Carter and the detectives began, Carter was given fresh *Miranda* warnings. He correctly and coherently explained to the police his understanding of his rights and signed a *Miranda* waiver form. This interrogation was focused on the same subject matter that gave rise to the officers' efforts to speak to him on May 27th, specifically Carter's conduct towards the victim on May 26th.

[¶22] The facts relating to the first three of the four factors weigh strongly in favor of the conclusion that Carter's invocation was scrupulously honored because the police immediately ceased questioning upon his first invocation, reinitiated questioning only after receiving news two full days later of Carter's desire to communicate with the lead detective assigned to his case,

10

and provided fresh *Miranda* warnings. *See id.* ¶ 51 (concluding that nineteen hours is a significant amount of time between the first and second interrogation). The final factor arguably weighs against the State because on both interrogation dates, the officers sought to question Carter on the same issues. Significantly, however, we note that no actual interrogation took place on May 27th.

[¶23] After consideration of the *Grant* factors, we conclude that Carter's invocation of his right to silence on May 27 was scrupulously honored by law enforcement authorities, and the State has satisfied its burden to establish that Carter's statements to the officers on May 29th were voluntary. We therefore affirm the suppression court's denial of Carter's motion to suppress.

## B. Sufficiency of the Evidence

[¶24] Carter argues that there is insufficient evidence to show that his attack on the victim, while violent, rose to the level of "extreme cruelty" as required for a conviction of aggravated attempted murder under 17-A M.R.S. § 152-A(1)(D).[4] He maintains that a finding of extreme cruelty can be made

---

[4] Section 152-A(1)(D) provides: "A person is guilty of aggravated attempted murder if that person commits attempted murder and, at the time of that person's actions, one or more of the following aggravating circumstances is in fact present: . . . The attempted murder was accompanied by torture, sexual assault or other extreme cruelty inflicted upon the victim."

only in the most extreme cases and must be supported by evidence of torture, sexual abuse, or gratuitous suffering, which he asserts were not present here.

[¶25]   "When determining whether the record contains sufficient evidence to support a conviction, we view the evidence in the light most favorable to the State to determine whether the fact finder could rationally find each element of the offense proved beyond a reasonable doubt."   *State v. Hodgson*, 2025 ME 88, ¶ 17, 345 A.3d 125 (quotation marks omitted).   In weighing the evidence, "a jury is not required to leave its common sense at the courthouse door." *State v. DesRosiers*, 2024 ME 77, ¶ 22, 327 A.3d 64. "We defer to all credibility determinations and reasonable inferences drawn by the fact finder." *State v. Cummings*, 2017 ME 143, ¶ 12, 166 A.3d 996.  In the context of sentencing in murder cases, we have stated that extreme cruelty may exist where "the viciousness of the murder differed in a substantial degree from that which inheres in the crime of murder." *State v. De St. Croix*, 2020 ME 142, ¶ 13, 243 A.3d 880 (quotation marks omitted).

[¶26]  Contrary to Carter's assertions, there was sufficient evidence for a jury to find, beyond a reasonable doubt, the existence of "extreme cruelty." Carter attacked the victim in three different locations over a period of hours. Moreover, he strangled her; attacked her with a hammer, causing more than

12

twenty skull fractures; threatened to cut her into pieces for her children to find; and then made her look at her injuries in a mirror before telling her she was going to die. Even after the police arrived at the scene, Carter continued to beat the victim, and it was only after the police shot him that he finally stopped. It is beyond question that this evidence was sufficient for the jury to conclude that, based on the totality of circumstances, the attempted murder was perpetrated with extreme cruelty. *See State v. Fortune*, 2011 ME 125, ¶ 36, 34 A.3d 1115; *State v. Wilson*, 669 A.2d 766, 769 (Me. 1996).

[¶27] We have never held that extreme cruelty is limited to torture, sexual assault, or gratuitous suffering, as Carter contends. However, even if extreme cruelty was limited to those narrow circumstances, the jury still could rationally find one or more of these elements to be present. Torture is defined as "[t]he infliction of intense pain to the body or mind to punish, to extract a confession or information, or to obtain sadistic pleasure." *Torture*, Black's Law Dictionary (12th ed. 2024). Carter initially attacked the victim to extract information about her alleged infidelity, and it can be inferred that he continued his attacks either to get this information or to punish the victim for the alleged infidelity. *See State v. Medeiros*, 2010 ME 47, ¶ 16, 997 A.2d 95 (stating that the fact finder "is permitted to draw all reasonable inferences from the evidence").

Further, Carter's acts caused gratuitous suffering: the attack lasted for hours and the victim was conscious for horrific portions of it, including when she was forced to look at the injuries Carter inflicted on her, such as the hole in her head at each of her temples, and she received permanent injuries. *Cf. State v. St. Pierre*, 584 A.2d 618, 622 (Me. 1990) (finding no gratuitous suffering or extreme cruelty because the victim was rendered unconscious "fairly quickly" and never awoke prior to being killed).

[¶28]  Accordingly, the evidence was sufficient to support Carter's conviction of the aggravated attempted murder.

## C.  Proportionality of Sentence

[¶29]  Carter argues that a sentence of life imprisonment is a disproportionate sentence when considering both the objective facts of the case and other cases involving both murder and attempted murder.  Carter maintains that other defendants convicted of aggravated attempted murders with similar facts were not given life sentences, thereby establishing, in his view, the disproportionality of his sentence.  Carter also asserts that the court should have considered the *Shortsleeves* factors when imposing a sentence of life imprisonment for aggravated attempted murder because it is required of

14

the court when considering a sentence of life imprisonment for intentional or knowing murder.  *See State v. Shortsleeves*, 580 A.2d 145, 149-50 (Me. 1990).

### 1.     Proportionality Review

[¶30]   "We review the legality and constitutionality of a sentence de novo."  *State v. Scott*, 2019 ME 105, ¶ 50, 211 A.3d 205 (quotation marks omitted).[5]     The Maine Constitution provides that "all penalties and punishments shall be proportioned to the offense."  Me. Const. art. I, § 9.  We have established a test for determining whether a sentence violates article one, section nine.  *State v. Stanislaw* (*Stanislaw II*), 2013 ME 43, ¶ 29, 65 A.3d 1242.

[¶31]   We first look to see "whether a particular sentence is greatly disproportionate to the offense for which it is imposed."  *State v. Lopez*, 2018 ME 59, ¶ 15, 184 A.3d 880 (quotation marks omitted).  If the sentence is not greatly disproportionate, "we examine whether it offends prevailing notions of decency."[6]  *Id.* (quotation marks omitted).  A sentence that fails either prong of

---

[5] Carter did not raise the disproportionality argument in the trial court, and in the past, we have reviewed unpreserved sentencing arguments for obvious error.  *See, e.g., State v. Goncalves*, 2025 ME 70, ¶ 32, 340 A.3d 639 (applying the obvious-error standard of review to unpreserved challenge to proportionality of sentence).  We have not yet had occasion to decide what steps a defendant must take to preserve an argument that the court's sentence is disproportionate.  Because we conclude that even under a de novo standard of review, Carter's sentence is not unconstitutionally disproportionate, we need not address here whether the issue was adequately preserved for our review.

[6] Because Carter does not argue that his sentence offends prevailing notions of decency, we evaluate only whether the sentence is proportionate.  *See Lopez*, 2018 ME 59, ¶ 15 n.3, 184 A.3d 880 (explaining that because the defendant challenged only the proportionality of the sentence and did

this test is unconstitutional. *Id.* In applying this test, "we are mindful that only the most extreme punishment decided upon by the Legislature as appropriate for an offense could so offend or shock the collective conscience of the people of Maine as to be unconstitutionally disproportionate." *State v. Ward*, 2011 ME 74, ¶ 18, 21 A.3d 1033 (alteration and quotation marks omitted).

[¶32] When conducting the first step of the test, we "must begin by comparing the gravity of the offense and the severity of the sentence." *Lopez*, 2018 ME 59, ¶ 16, 184 A.3d 880 (quotation marks omitted). "Factors affecting the proportionality of a sentence to the offense are determined on a case-by-case basis because no one factor will be dispositive in a given case." *Stanislaw II*, 2013 ME 43, ¶ 30, 65 A.3d 1242 (quotation marks omitted). We also must consider the purpose of the legislation and the "importance and magnitude of the public interest sought by it to be protected." *Lopez*, 2018 ME 59, ¶ 16, 184 A.3d 880 (quotation marks omitted).

[¶33] We compare the gravity of the offense to the severity of the sentence by "(1) evaluating where that defendant's term of imprisonment fell within the range of incarceration time authorized by the Legislature and (2) considering the facts of a case in conjunction with the commonly accepted

not argue that the sentence offended prevailing notions of decency, review of the claim was limited to the issue of proportionality).

16

goals of punishment."[7]  *Id.* (citations and quotation marks omitted).  If this comparison "results in an inference of gross disproportionality we then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction."  *Id.* ¶ 17 (quotation marks omitted).

[¶34]  Considering the offense of aggravated attempted murder, Carter's sentence of life imprisonment is not unconstitutionally disproportionate. Section 152-A(2) expressly authorizes life imprisonment for this offense,[8] and we have previously affirmed the constitutionality of a life sentence for the crime of aggravated attempted murder under this section.  *See Fortune*, 2011 ME 125, ¶ 38, 34 A.3d 1115 (holding that "the Legislature had the authority to enact this statutory provision and that section 152-A's provision of the possibility of life imprisonment does not offend [article one, section nine, clauses two and five] of the Maine Constitution").  Plainly, the sentence imposed here fell within the range of incarceration time authorized by the legislature.  *See Lopez*, 2018 ME 59, ¶¶ 20-22, 184 A.3d 880 (concluding that a twenty-year sentence for felony murder was not unconstitutionally disproportionate because, in part, it fell

---

[7]  Title 17-A M.R.S. § 1501 (2026) lists the goals of sentencing, which include preventing crime, encouraging individualization of sentences, permitting sentences based on factors of the crime committed, and recognizing that domestic violence is a serious crime.

[8]  Title 17-A M.R.S. § 152-A(2) has been amended since 2023, *see* P.L. 2025, ch. 207, § 4 (effective Jun. 20, 2025) (codified at 17-A M.R.S. § 152-A(2) (2026)), although not in any way that affects the analysis.

within the range of incarceration authorized by the Legislature and was previously found to be proportionate when it was the maximum sentence available for the offense).

[¶35]  The facts of this case as recounted by the court in its sentencing analysis, "in conjunction with the commonly accepted goals of punishment," *id.* ¶ 16 (quotation marks omitted), further support our conclusion that Carter's sentence is not unconstitutionally disproportionate.  Carter's sentence reflected his extensive criminal history, including his conviction for domestic violence assault and that he was on probation for that assault; the fact that this was a crime of domestic violence; and the impact on the victim.  His sentence likewise advances several of the sentencing goals: preventing crime through deterrence and restraint in the interest of public safety, sentencing in a manner that does not diminish the gravity of the offense, and recognizing domestic violence as a serious crime.  *See* 17-A M.R.S. § 1501(1), (8), (9).  While the sentence is the maximum allowable by law, we conclude that the ultimate sentence does not raise an inference of gross disproportionality.

[¶36]  Further, even if we drew an inference of gross disproportionality, a comparison of the sentence to other similar sentences bolsters our conclusion that Carter's sentence is not constitutionally disproportionate.  The two

"comparable" cases that the court considered at sentencing were *State v. Fortune* and *State v. Freeman*. *Fortune*, 2011 ME 125, 34 A.3d 1115; *Freeman*, 2014 ME 35, 87 A.3d 719. In *Fortune*, we upheld as proportional a sentence of life imprisonment for two convictions of aggravated attempted murder stemming from a home invasion where a father and his daughter suffered permanent injuries as a result of a machete attack. 2011 ME 125, ¶¶ 8-14, 38-40, 34 A.3d 1115. Notably, there was no indication in that case that the defendant had any prior criminal history, and the crime was not one of domestic violence. In *Freeman*, we upheld as proportional a sentence of fifty years with ten years suspended for two convictions of aggravated attempted murder where the defendant had started two fires in the victims' home while they slept. 2014 ME 35, ¶¶ 2-10, 23, 87 A.3d 719. The defendant had a lengthy criminal history and was the subject of multiple orders of protection from abuse. *Id.* ¶ 10. However, unlike both *Fortune* and the instant case, none of the victims in the *Freeman* case suffered any injuries, much less permanent injuries. *Id.* ¶ 23.

[¶37] All of the aggravating factors the courts relied on to reach the sentences in both *Fortune* and *Freeman* are present here. Carter's sentence is

not disproportionate when compared to similar sentences received by defendants given the presence of a large number of aggravating factors.

[¶38]   As a result, we conclude that Carter's sentence is not unconstitutionally disproportionate, and thus there is no error, let alone obvious error.

### 2.   *Shortsleeves* Factors

[¶39]   Because *Fortune*, aside from this case, is the only case where a sentence of life imprisonment was imposed for a conviction of aggravated attempted murder, we find it "appropriate to provide the sentencing court with broad guidelines for the circumstances in which the harshest penalty, a life sentence, may be imposed." *Shortsleeves*, 580 A.2d at 149.

[¶40]   In *Shortsleeves*, we established a list of potential aggravating factors that could justify a sentence of life imprisonment for intentional or knowing murder.[9] *Id.* at 149-50.  The presence of any one of these aggravating factors justifies a life sentence, but the sentencing court may still consider whether mitigating factors require a lesser sentence. *Id.* at 150. We established

---

[9]  The list includes premeditation-in-fact; multiple deaths; murder committed by a person who has been previously convicted of a homicide or a crime involving the use of deadly force; murder accompanied by torture, sexual abuse, or extreme cruelty to the victim; murder committed in a penal institution by an inmate of that institution; murder of a law enforcement officer while the officer is in performance of his or her duties; and murder of a hostage. *Shortsleeves*, 580 A.2d at 149-50.

this list to provide a "workable set of criteria for distinguishing life sentences from sentences for a term of years." *State v. Hutchinson*, 2009 ME 44, ¶ 36, 969 A.2d 923 (quotation marks omitted). In *Hutchinson*, we clarified that the sentencing court should consider the *Shortsleeves* factors in step one of its *Hewey* analysis, *id.* ¶ 38, and that the sentencing court is not required to explicitly "invoke a continuum of seriousness" so long as the analysis reflected that the crime was "among the most serious ways in which the crime might be committed," *id.* ¶ 42. Shortly after, we explained that the list of *Shortsleeves* factors was neither "exhaustive nor all-inclusive." *State v. Waterman*, 2010 ME 45, ¶ 44, 995 A.2d 243. We explained that "because the facts surrounding a conviction for murder do not sort neatly into separately identifiable characteristics," an aggravating *Shortsleeves* factor may be taken into account when considering the imposition of a life sentence both at step one of a court's *Hewey* analysis and at step two as an aggravating factor so long as the court considers the fact for different purposes. *State v. Lord*, 2019 ME 82, ¶ 32, 208 A.3d 781.

[¶41] While we have not explicitly required courts to consider and address the *Shortsleeves* factors when imposing a sentence of life imprisonment for aggravated attempted murder, *see Fortune*, 2011 ME 125, ¶ 41, 34 A.3d

1115, we now clarify and announce that the best practice for sentencing courts is to include a specific and express analysis of *Shortsleeves* factors when conducting the sentencing analysis in cases involving the possibility of a life sentence for aggravated attempted murder. Because "[i]mprisonment for life—a lifetime in prison, with no potential for release—is inherently different than a sentence for a term of years even when the term of years is lengthy," *Lord*, 2019 ME 82, ¶ 26, 208 A.3d 781 (quotation marks omitted), a court should not analyze a potential sentence of life imprisonment for aggravated attempted murder with any less diligence or circumspection than it would if it were imposing the same sentence for the crime of intentional or knowing murder. Here, although the court did not expressly address the *Shortsleeves* factors, such analysis was implicit in the court's sentencing determination, and for the reasons we have discussed, we see no reason to disturb the sentence.[10]

## D.    Trial Penalty

[¶42]  Carter argues that he suffered a penalty for choosing to go to trial, as evidenced by the State's initial plea offer of thirty years' imprisonment, with all but twenty-one years suspended, on the charge of aggravated attempted

---

[10]  As noted, our decision today does not mandate consideration of *Shortsleeves* factors in cases of aggravated attempted murder where life imprisonment is a possibility; rather, we encourage courts to consider it as a best practice in such matters.

22

murder. Carter maintains that the disparity between the offer and the sentence he received is so great that it indicates at least a subconscious choice by the court to penalize him.

[¶43] A claim that a sentence was increased because the defendant exercised the right to have a trial goes to the legality of the sentence, and so we "review the sentencing court's determination of the basic sentence de novo for misapplication of legal principles and its determination of the maximum sentence for abuse of discretion."[11] *State v. Chase*, 2023 ME 32, ¶ 28, 294 A.3d 154 (quotation marks omitted). A defendant's decision to go to trial cannot be used to impose a more severe sentence. *See id.* ¶ 29; *State v. Farnham*, 479 A.2d 887, 891 (Me. 1984). When the sentencing court references the defendant's decision to stand trial, we review the reference in the context of the entire sentencing proceeding. *Chase*, 2023 ME 32, ¶ 30, 294 A.3d 154. If it "reasonably appears from the record" that the sentencing court relied, to any degree, on the defendant's decision to go to trial when imposing sentence, the sentence is invalid. *Id.* (quotation marks omitted). "Any doubt as to whether the defendant was punished for exercising his right to trial must be resolved in favor of the defendant." *Id.* (quotation marks omitted).

---

[11] Because Carter raised the possibility of a "trial penalty" during his sentencing proceeding, the issue is preserved and we do not require Carter to show obvious error.

[¶44]  The court's only reference to Carter's decision to stand trial was an explicit statement that the court, in setting the sentence, had *not* considered any of the plea offers that the State had made and had *not* considered Carter's decision to stand trial.  Looking at the entirety of the sentencing proceeding, the court correctly focused on the objective factors at the first step, then correctly balanced the mitigating factors against the aggravating factors before imposing the maximum sentence of life imprisonment.  There is nothing in the record of the sentencing proceeding to suggest that the court relied on or was influenced by Carter's decision to stand trial.  Carter's contention that the court imposed a trial penalty, which is based solely on the court's passing reference to his decision to stand trial, is unavailing, and we conclude that the court did not impose a trial penalty or abuse its discretion in finding the maximum sentence warranted.  *See Waterman*, 2010 ME 45, ¶ 49, 995 A.2d 243 (concluding that the court did not abuse its discretion in setting the maximum sentence at life imprisonment when it found the aggravating factors of criminal history and impact on the victims to outweigh the mitigating factor of substance use).

The entry is:

Judgment affirmed.

24

---

James M. Mason, Esq. (orally), Handelman & Mason LLC, Brunswick, for appellant Djvan Carter

R. Christopher Almy, District Attorney, and Chelsea R. Lynds, Asst. Dist. Atty. (orally), Prosecutorial District V, Bangor, for appellee State of Maine

Penobscot Unified Criminal Docket docket number CR-2023-1522
FOR CLERK REFERENCE ONLY